UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **KIMBERLY TAYLOR,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 2:25-cv-00015-LEW ) |
| **UNITED PARCEL SERVICE, INC.,** | ) ) ) |
| Defendant. | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff Kimberly Taylor, by and through undersigned counsel, hereby complains against Defendant United Parcel Service, Inc. and alleges the following:

### INTRODUCTION

1. This action arises because Plaintiff alleges that she was denied a reasonable accommodation and terminated on February 23, 2023, by the Respondent, because of her disability in violation of the Americans with Disabilities Act of 1990, as amended (ADA) as well as violation of the Maine Human Rights Act (MHRA).

### THE PARTIES

2. Plaintiff Kimberly Taylor ("Plaintiff" or "Taylor") is an individual residing in the Town of Lebanon, County of York, and State of Maine.

1

3. Defendant United Parcel Service, Inc. ("Defendant" or "UPS") is a global package delivery service with hubs throughout the United States.

4. UPS employed Taylor at all times relevant to this Complaint.

5. UPS has more than 500 employees on its payroll in each of 20 or more calendar weeks during the current and/or preceding calendar year.

## JURISDICTION AND VENUE

6. Prior to filing this Complaint, Taylor filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the EEOC. Taylor received a notice of right to sue letter from the EEOC on October 17, 2024.

7. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in Southern Maine.

8. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS

9. UPS hired Taylor in 1994 to work as a part-time Supervisor.

10. Taylor worked her way up through the organization and most recently worked for UPS as a full-time Human Resources Specialist working primarily remotely and was responsible for onboarding new employees and staffing driver jobs for the peak season.

11. On November 4, 2020, Taylor reported to the Wells, Maine UPS center after receiving a text message from her manager, Tiffany Contois, stating that a coworker had a family emergency and would be away from work for some time and Taylor was needed to complete work that had been left incomplete.

12. Later that same day, Taylor travelled from Wells to the South Portland UPS center where Taylor had primarily worked for the previous five years.

13. Cindy Keene and Jolene McNally also worked at the South Portland UPS center seasonally to assist with the peak season onboarding process and were present on November 4, 2020.

14. Keene, McNally, and Taylor worked very closely together in a small, closed office space and occasionally shared the telephone.

15. Unbeknownst to Taylor, Keene had contracted Covid. The two worked the remainder of the day and half of the following day together.

16. On the afternoon of November 5, 2020, Taylor travelled to the Auburn UPS center to finish out the day. On her way home, Taylor began to feel ill.

17. The following day, Taylor went into Urgent Care in Dover, NH fir a rapid covid test that returned a negative result. However, on November 7, 2020, a PCR test revealed that Taylor tested positive for Covid.

18. Taylor continued to work from home for one more day, but then was to ill to continue working. She experienced congestion, a cough, and felt she was unable to catch her breath. Taylor coded these days as sick days on her time card.

19. Taylor's symptoms improved and she began to work from home again through August 31, 2021, with only a few in-person trips to a UPS center when a task could not be completed remotely such as ADA meetings, employee investigations, and Human Resources follow-up could eventually be accomplished remotely via zoom.

20. In February of 2021 Taylor began to treat with Nurse Practitioner Vanessa Amatucci at Wentworth Douglass Hospital for lingering symptoms of Covid such as inability to sleep, cognitive issues such as concentration and recall, fatigue, and body aches.

21. Taylor's husband and family assisted her with daily activities that would leave her exhausted.

22. Amatucci ordered blood tests for Taylor which revealed Taylor had high calcium levels. Amatucci recommended a parathyroidectomy.

23. The surgery was scheduled for August 31, 2021. Taylor was out of work from the date of her surgery through September 20, 2021.

24. On September 21, 2021, Taylor returned to work and worked remotely that first week.

25. On September 28, 2021, Taylor went next door to have lunch with her mother. Her mother went into cardiac arrest and died.

26. Taylor sent an email to her manager, Tiffany Contois, letting Contois know that her mother had passed and she would take bereavement leave for the rest of the week.

27. The following week Taylor had a planned vacation from October 5, 2021 to October 9, 2021.

28. At this time, Taylor's doctor was disappointed by the lack of improvement in Taylor's bloodwork and physical symptoms. Therefore, Amatucci

recommended that Taylor go to Dartmouth Hitchcock where they were beginning to treat patients with "Long Covid" or "long-haul" symptoms from Covid infections.

29. Taylor took a medical leave from October 12, 2021 through October 16, 2021 and then took the final vacation time she had remaining for the year the following week.

30. Taylor went out on disability leave on October 26, 2021.

31. UPS outsources benefits administration to Hartford who managed Taylor's leave.

32. Hartford failed to keep an accurate record of Taylor's dates of absence despite repeated attempts to have it corrected.

33. On October 16, 2021, Taylor received a message from UPS "paylogix" that a payment to maintain her health insurance and medical benefits was due. Taylor understood that while out on leave she was responsible for making these payments in order to continue coverage, so she intended to do so with each notice.

34. On December 7, 2021, Taylor completed a Long Covid study at Alfred Hitchcock. The findings support the fact that she was experiencing Long Covid.

35. Taylor did not receive another notice regarding payment for medica benefits until January 13, 2022.

36. On January 19, 2021, Taylor discovered that her medical benefits had been canceled.

37. Taylor contacted Brenda Doupe, her new supervisor, as well as the Director of Human Resources Operations, Karsys Hernandez and Janitzia Cabrera

5

as she was unsure of who to contact with the new chain of command. Taylor wanted to know why her benefits were suddenly canceled despite making payments.

38. Doupe initiated HR case number HRC2937241 to ascertain what had happened to Taylor's benefits.

39. Without explanation as to why they were canceled in the first place, Taylor's medical benefits were reinstated on January 21, 2022.

40. Both Taylor's husband and daughter had to put off medical treatment because of the canceled insurance coverage.

41. On October 28, 2022, Hartford notified Taylor that her Short Term Disability claim had been denied, but that she could appeal the decision.

42. To treat her symptoms Taylor was attending physical therapy for vertigo, had an MRI, bloodwork testing for diabetes and gout, treating with ENT for the ringing in her ears. Taylor took a sleep apnea test for exhaustion but that was negative. Taylor began physical therapy for cognitive delay and that seemed to help some. Taylor underwent a long covid psychiatric evaluation, and it showed that she had cognitive delays. Dartmouth Hitchcock provided Taylor's medical providers at Wentworth Douglas with a treatment plan such as floating in the PT warm pool and exercises focused on cognitive delay learning to work on tasks at a different pace to avoid the crash that would typically follow exertion.

43. In February of 2022 Taylor's medical benefits were cancelled again. As a result she was unable to continue treating with the physical therapy group and was provided handouts to continue the work at home.

6

44. On February 10, 2022, Taylor emailed Doupe regarding the cancellation of her benefits again. Taylor expressed frustration over the issue. Taylor had also received payment of $5,000 from UPS, but she had not worked and did not know what the payment was for. After doing a payroll inquiry Doupe let Taylor know the payment was for stock that had vested. In addition payroll reflected that Taylor had an additional week of vacation. Doupe did not tell Taylor she would have to pay that back.

45. On February 10, 2022, Taylor provided Hartford with her medical documentation in support of her appeal of the denial of STD leave.

46. On March 15, 2022, Lillyanna Wood of Hartford sent Taylor a message that her appeal had been denied.

47. Taylor continued a personal leave of absence while she continued with an appeal.

48. Taylor discovered that in denying the appeal Hartford had not accounted for any of her physical therapy appointments, the Long-Covid study at Dartmouth Hitchcock, or her ongoing care with Amatucci.

49. Taylor had surgery scheduled for April 14, 2022, but she learned that once again her benefits had been cancelled despite making the requisite payments.

50. Taylor's husband had to miss a long-anticipated appointment with the pain clinic for his chronic back pain.

51. Once again, Taylor emailed Doupe asking for clarification regarding her benefits. The benefits were reinstated in time for Taylor's surgery.

52. During the procedure, the surgeon discovered cancer in her left breast. He was able to remove all of the cancer, but she had a large hematoma on her breast which set back her recovery.

53. In March of 2022 Taylor received notification from SSDI that she was approved for Social Security Disability benefits.

54. On May 4, 2022, Taylor notified Doupe that she was continuing with her physical therapy and was hoping to return to work. Doupe did not respond and Taylor had not heard anything from anyone at UPS.

55. On June 6, 2022, Taylor sent her third appeal to Hartford. Taylor later learned that her appeal had been processed and she had been assigned to a case manager.

56. Taylor asked Hartford if she should also file a Workers' Comp claim given that she had contracted Covid while at work due to an "outbreak" in the office, but received no response.

57. On June 6, 2022, Taylor did a Functional Capacity Evaluation at Wentworth Douglas at the request of Hartford. The test was exhausting and I required rest for a days following the FCE.

58. On June 8, 2022, Doupe emailed Taylor asking her to return her UPS laptop and cellphone. Taylor told Doupe that she was trying to return to work and was worried about why she was now being asked to return the equipment especially considering how close Taylor was to retirement. Doupe assured Taylor that the request was entirely procedural.

59. On June 22, 2022, Taylor sent Doupe a message requesting reimbursement for cell phone payments she had made since she was unable to submit a request for reimbursement while out on leave. The total amount Taylor paid was $573.30.

60. Doupe responded that she had processed the reimbursement request, but Taylor never received reimbursement.

61. On July 14, 2022, Taylor met with her oncologist who recommended that she begin taking Irimidex as preventative medication for the next five years. Without insurance the medication costs $900 per refill.

62. On July 19, 2022, Taylor received notice from Hartford that her STD leave had been approved.

63. On August 5, 2022, Taylor emailed Doupe letting her know that the STD had been approved.

64. On August 8, 2022, Taylor provided Doupe with a detailed expense bill for reimbursement of the cell phone payments Taylor had made.

65. On August 19, 2022, Taylor received $6,232.07 in reimbursement for the COBRA payments she had made while her STD had been denied.

66. On September 2, 2022, Taylor received $1,832.96 in reimbursement for the COBRA payments she had made while her STD had been denied.

67. On September 7, 2022, Dr. Jeffrey Parsonnet, an infection disease doctor at Dartmouth Hitchcock, provided Taylor with additional exercises to perform as part of her physical therapy.

68. On September 22, 2022, speech pathology updated her charts with what Taylor had worked on to combat brain fog and cognitive delay issues.

69. On September 23, 2022, Taylor received the first notice from Paylogix that she had missed a benefit payment to maintain coverage so she immediately made a payment.

70. On October 4, 2022, Taylor emailed Doupe regarding the inaccuracy of her leave dates. Doupe instructed Taylor to call MYHR to deal with the issue so she did.

71. On October 7, 2022, Taylor completed an EMG on both hands as she was still experiencing difficulty sleeping and had severe nerve pain in her right hand. Taylor could not hold a pen without pain. A carpal tunnel release was scheduled.

72. On October 14, 2022, Taylor had an ultrasound of her neck and bloodwork to follow up on her parathyroidectomy and it showed improvement.

73. On October 22, 2022, Taylor initiated an ADA case through MYHR was provided case number HRC4283660 and was told someone would be in touch. No one contacted Taylor to follow up on her ADA request.

74. Taylor was hoping to return to work in a part-time capacity as her treatment resulted in her feeling better, but she was still easily exhausted.

75. On October 24, 2022, Taylor completed diabetes education as she had advanced from prediabetic to Type 2 Diabetic.

76. From November 12, 2022, through February 9, 2023, Taylor received a missed payment notification from paylogix. Taylor made a payment each week.

77. On December 7, 2022, Taylor met with a bariatric team to consider surgery.

78. On October 12, 2022, Taylor completed a psychiatric evaluation for bariatric surgery.

79. On February 9, 2023, Taylor underwent surgery for a carpal tunnel release on her right hand.

80. On February 23, 2023, Taylor received a letter of termination from UPS that had been delivered to her via UPS. The letter stated she had been administratively separated as of February 15, 2023.

81. Between October 22, 2022 and February 23, 2023, no one from UPS had contacted Taylor regarding her ADA request or to ascertain if she was able to return to work.

82. On February 27, 2023, Taylor received COBRA paperwork explaining that she could maintain health benefits for herself and her husband for $1360 per month. Taylor elected to have this coverage as her family could not go without health insurance.

83. On March 2, 2023, Taylor emailed Doupe regarding her termination five months prior to being eligible for full retirement from UPS.

84. Doupe responded that she was unaware of the decision and that it was made above her pay grade.

85. On March 9, 2023, Taylor received notification from Paylogix that she had missed a benefit payment. However, Taylor was unable to log into Paylogix portal as she was no longer an employee.

86. On March 20, 2023, Taylor contacted the Director of Human Resources, Paul Tanguay, and his supporting manager Cristal Quan, regarding her termination. Taylor questioned how an employee could be terminated after acquiring an illness at work. Tanguay responded that her concern would be investigated.

87. On March 23, 2023, Taylor's case was assigned to case number HRC4245682 and Melissa Gloddy from UPS security agreed to host a call to review Taylor's concerns. Gloddy had Taylor review and sign UPS policy and the call was scheduled for March 28, 2023.

88. On March 28, 2023, Gloddy and another security individual reviewed Taylor's concerns. The two questioned how Taylor could still be experiencing symptoms from getting COVID in 2020. Taylor explained she had been treating with medical providers for Long Covid, that she had been in contact with Doupe, and that she had initiated an ADA request but had no response to it.

89. The two explained to Taylor that everyone believed she was out because of cancer. Taylor responded that she was a private person and her updates had always included that she intended to return to work.

90. The pair then asked if Taylor had received a six-month letter explaining that she had to return to work or face separation. Taylor had never received such a letter and told them so.

91. The only letter Taylor had received from UPS was the termination letter.

92. Taylor went on to explain that she had not been reimbursed for the UPS cell phone bill she paid while on leave despite her many attempts to get that resolved as well as her multiple attempts to correct her leave dates through MYHR, UPSHR Help, and her supervisor. She also communicated that no one responded to her inquiry regarding workers' compensation. Taylor explained that it had been a long process of denial and then an STD leave approval that only started 7/19/22. Taylor asked the pair how her employment could be separated even though leave time that was approved retroactively, given it took months of her time to fight for that approval. The additional work Taylor had to do to fight for this approval delayed proper healing time that she could have focused on. This also added a magnitude of stress in Taylor's life, never knowing when benefits would be shut off without notice and if that may happen during a time when she urgently needed care. Taylor reiterated that her communications with her immediate supervisor had always been that she wanted to return and that she was even willing to work at a lesser job through an ADA request that never was processed. They told Taylor they would get back to her in a week with their completed investigation. That did not occur.

93. On 3/31, 4/7, 4/13, and 4/20 of 2023, Taylor received notification from Paylogix that she had missed payments for her benefits. Taylor did not understand why she was receiving these notices given that she had made payments in full for her benefits and given she was no longer able to access the portal as she was no longer an employee for UPS. Taylor believed this was harassment.

94. On April 13, 2023, Taylor emailed Gloddy requesting an update on her case. Gloddy did not respond.

95. On May 2, 2023, Taylor followed up again with Gloddy asking for an update. Gloddy informed Taylor that her concern had been investigated and was unfounded.

96. On May 4, 2023, Taylor received a letter from State of Maine Workers' Compensation Board notifying her that she had 10 days to respond to the denied claim by Liberty Mutual.

97. On May 10, 2023, Taylor visited the EEOC office in Boston as she was unable to get an appointment online.

98. At UPS, employees earn DDB credits for each year of employment for a maximum of 30 years. Taylor had earned 27 DDB credits, which would reduce her retiree medical premiums by $6,750 per year. When eligible for medicare it would reduce her co-insurance cost by $1,134.00 per year. This is no longer available to Taylor because of the termination.

99. On April 19, 2024, the EEOC Investigator and Area Director, Kenneth An, JD, issued a final determination concluding UPS' "asserted defense does not

withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party on account of her disability in violation of the ADA."

100. Part of UPS' defense was that it maintained a fixed-termination policy, which clearly stated that absence may include "time period spent on a personal leave or performing a residual disability assignment… regardless of [the employees] status on short or long term disability… or on worker's compensation leave." The EEOC determined that such a policy does not negate the employers duties and obligations under the ADA, which includes considering reassignment as an accommodation of last resort that would, for instance, allow an employee to remain out of work for more than 12 months, in the absence of an undue hardship.

101. Taylor applied for a part-time operations position with UPS in the Fall of 2024 but was not hired for the position. Taylor believes this was in retaliation for her EEOC complaint.

### COUNT I – DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA
### (29 U.S.C. § 621 *et seq*.)

102. Plaintiff repeats the allegations contained in Paragraphs 1 through 101 as if fully stated herein.

103. Taylor was a qualified individual with a disability within the meaning of the ADA.

104. Defendant regarded Taylor as having a disability that substantially impaired her ability to work, daily activities, and sleep. Taylor was disabled as determined by SSDI.

105. Defendant failed to engage in the interactive process with Taylor.

106. Defendant failed to accommodate Taylor's perceived and actual disability, in violation of the ADA.

107. Defendant discriminated against Taylor because of her disability.

108. As a result of Defendant's disability discrimination and willful violation of the ADA, Taylor has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

109. Defendant recklessly, knowingly, and/or willfully discriminated against Taylor in violation of the ADA and therefore Plaintiff is entitled to liquidated and punitive damages.

WHEREFORE, Plaintiff Kimberly Taylor requests that the Court award her damages for Defendant's violation(s) of the ADA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT II – RETALIATION IN VIOLATION OF THE ADA
**(29 U.S.C. § 621 *et seq*.)**

110. Plaintiff repeats the allegations contain in Paragraphs 1 through 109 as if fully stated herein.

111. The ADA prohibits an employer from taking adverse action against an employee because they exercised their rights under the Americans with Disabilities Act, such as requesting a reasonable accommodation for their disability, filing a complaint about disability discrimination, or simply informing their employer about their disability.

112. UPS retaliated against Taylor by failing to engage in the interactive process.

113. UPS retaliated against Taylor by failing to even respond to her request for accommodation meaning they failed to determine whether she was a qualified individual or whether an accommodation would cause undue hardship.

114. UPS retaliated against Taylor by terminating her employment.

115. UPS retaliated against Taylor by not hiring her for the part-time position she applied for in the Fall of 2024.

116. There is a causal connection between the request for accommodation and termination by temporal proximity as well as their utter failure to follow internal policy in responding to her request for accommodation.

117. Defendant recklessly, knowingly, and/or willfully retaliated against Taylor in violation of the ADA and therefore Plaintiff is entitled to liquidated and punitive damages.

WHEREFORE, Plaintiff Kimberly Taylor requests that the Court award her damages for Defendant's violation(s) of the ADA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT III – FMLA RETALIATION AND DISCRIMINATION
### 29 U.S.C. § 2615(a)(1)

118. Plaintiff repeats the allegations contained in Paragraphs 1 through 117 as if fully stated herein.

119. Taylor was eligible and qualified for leave under the FMLA.

120. Taylor provided Defendant with appropriate notice of her need to take leave under the FMLA. After Taylor went out on leave in August 2021, UPS retaliated against Taylor by repeatedly canceling her medical insurance benefits and refusing to reimburse her for cell phone expenses, as well as failing to respond to her ADA request and her termination.

121. As a result of Defendant's FMLA retaliation, Taylor has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

122. Defendant's violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

WHEREFORE, Plaintiff Kimberly Taylor requests that the Court award her damages for Defendant's violation of the FMLA in the form of lost back pay, front

pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT IV – VIOLATIONS OF THE MAINE FAMILY MEDICAL LEAVE LAW
## 26 M.R.S. § 847

123. Plaintiff repeats the allegations contained in Paragraphs 1 through 122 as if fully stated herein.

124. As set forth more fully in Count III above, Defendant's conduct amounts to a violation of the Maine FMLL.

125. As a result of Defendant's violation of the Maine FLML, Figueira has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

126. Defendant's violation of the Maine FMLL was willful, justifying an award of liquidated damages under the Maine FMLL. Alternatively, Plaintiff is entitled to liquidated damages of $100 per day beginning on the date that Taylor suffered retaliation as a result of the protected leave.

WHEREFORE, Plaintiff Kimberly Taylor requests that the Court award her damages for Defendant's violation of the Maine FMLL in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## JURY TRIAL DEMAND

19

Plaintiff Kimberly Taylor hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: January 15, 2025          */s/ Laura H. White*

          _____
          Laura H. White, Bar No. 4025
          *Attorney for Plaintiff*
          WHITE & QUINLAN, LLC
          62 Portland Rd., Suite 21
          Kennebunk, ME 04043
          (207) 502-7484
          *lwhite@whiteandquinlan.com*

          */s/ Danielle M. Quinlan*

          _____
          Danielle M. Quinlan, Bar No. 5480
          *Attorney for Plaintiff*
          WHITE & QUINLAN, LLC
          62 Portland Rd., Suite 21
          Kennebunk, ME 04043
          (207) 502-7484
          *dquinlan@whiteandquinlan.com*